**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **LATINA RAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.:** |
| **vs.** | ) | |
| | ) | |
| **THE LINCOLN NATIONAL** | ) | |
| **LIFE INSURANCE COMPANY,** | ) | |
| | ) | |
| | ) | |
| **Serve:** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

**COMES NOW** Plaintiff Latina Ray by and through undersigned counsel, pursuant to the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. §1001 *et. seq*., and for her cause of action against Defendant the Lincoln National Life Insurance Company, respectfully states the following:

1.  Plaintiff Latina Ray ("Ms. Ray") beings this action against Defendant the Lincoln National Life Insurance Company ("Lincoln") for damages caused by the Defendant's breach of statutory, contractual, and fiduciary obligations and violations of the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. §1001 *et. seq*. ("ERISA").

2.  This is an action brought pursuant to 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

3.  Under 29 U.S.C. §1132(f), the Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

4.  Venue is proper in this District pursuant to 29 U.S.C. §1132(e)(2), in that the subject employee welfare benefit plan and employee insurance program are administered in this

District, the breaches of duty herein alleged occurred in this District, and Defendants reside or are found in this district.

**PARTIES**

5.      Ms. Ray is an individual residing in St. Louis County, in the Eastern District of Missouri. Ms. Ray is a vested participant in a Group Insurance Policy for certain employees of Select Rehabilitation, LLC ("Select Rehabilitation"), which provides an employee benefit plan within the meaning of 29 U.S.C. § 1132(a) and is located in the Southern District of Illinois.

6.      Ms. Ray has standing to bring this action as a beneficiary under 29 U.S.C. §1132(a).

7.      Lincoln provides health care coverage for certain employees of Select Rehabilitation under an employee welfare benefit plan (hereinafter "Plan") within the meaning of 29 U.S.C. § 1002. Specifically, Lincoln provides health insurance benefits, including Long-Term Disability (LTD) benefits.

8.      Lincoln is an insurance company incorporated in Indianna and doing business in Illinois under a license to do business as a Foreign Insurance Company.

9.      Lincoln administers and pays benefits under the terms of the LTD Plan and is a fiduciary within the meaning of 29 U.S.C. §§1002(21) and 1102.

10.      Select Rehabilitation is an Illinois Corporation and serves as the Plan administrator and sponsor under the meaning of 29 U.S.C. § 1002(16).

**COUNT I**<br>**DENIAL OF BENEFITS PURSUANT TO 29 U.S.C. §1132(a)(1)(b)**

11.      Ms. Ray was employed as an occupational therapy assistant.

12.      In 2017, Ms. Ray became disabled and unable to work due to symptoms related to (1) a spinal disc bulge and spinal stenosis, (2) seronegative rheumatoid arthritis, (3) chronic fatigue syndrome, and (4) fibromyalgia.

13.     Since 2017, Ms. Ray's medical records demonstrate an elevated C-reactive protein (CRP), significant stiffness, swelling, limping, crepitus, and tenderness, all of which are synonymous with her multiple diagnoses.

14.     Ms. Ray described the pain she experiences as aching numbness, which can be piercing, shooting, stabbing, throbbing, and sharp.

15.      Ms. Ray's symptoms are aggravated by lifting, laying, resting, pushing, sitting, standing, and walking.

16.     Ms. Ray's last day of work was on December 26, 2017.

17.     As delineated in the Plan, Ms. Ray applied for and was granted long-term disability benefits after the applicable exclusionary period.

18.     To receive LTD benefits under the Plan issued to Select Rehabilitation, LLC, Ms. Ray needed to satisfy the following Plan provisions defining total disability:

    a.  During the Elimination Period and Own Occupation Period, [total disability] means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.

    b.  After the Own Occupation Period, [total disability] means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any Gainful Occupation.

19.     Under the "Own Occupation Period," an insured is only entitled to twenty-four months of benefits.

20.     Following the conclusion of this twenty-four-month period, Lincoln denied Ms. Ray further benefits.

21.     On February 20, 2020, Ms. Ray filed her first timely appeal of the adverse benefit determination.

22.     On May 13, 2020, Lincoln upheld its denial, stating the opinions of Ms. Ray's treating physicians regarding her condition and recovery were not supported by the medical evidence.

23.     On November 20, 2020, Ms. Ray filed her second appeal.

**Peer Medical Reviews**

24.     On January 4, 2021, Ms. Ray's claim file was reviewed by health care consultant Billiejo M.

25.     According to the January nursing memorandum, a May 5, 2020, peer review, written by Dr. Angelica Shepard, remained appropriate and supported.

26.     Dr. Shepard found that Ms. Ray has a medical history significant for the following: (1) seronegative rheumatoid arthritis, (2) lumbar spine degenerative disc disease, (3) neck pain, (4) fibromyalgia, (5) chronic fatigue syndrome, (6) type 2 diabetes mellitus, (7) hypertension, (8) depressive disorder, (9) anxiety disorder, and (10) bipolar affective disorder.

27.     Regarding Ms. Ray's depressive disorder, anxiety disorder, and bipolar disorder, Dr. Shepard declined to comment.

28.     In relation to the remaining medical conditions, Dr. Shepard concluded that the provided medical documentation did not support functional restrictions and limitations set forth by Ms. Ray's providing physicians.

29.     Significant to Ms. Ray's claim at hand, Dr. Shepard concluded the following:

a. Ms. Ray's seronegative rheumatoid arthritis was well managed, medical records did not reveal any physical abnormalities, and activity restrictions and limitations were not medically necessary.

b. Ms. Ray's chronic fatigue and fibromyalgia did not warrant functional restrictions and limitations because the medical records failed to document abnormal physical examination that would indicate widespread pain, allodynia, stiffness, or poor sleep quality.

c. Finally, Dr. Shepard concluded that Ms. Ray's foraminal stenosis resulting from her lumbar spine degenerative disc disease was only mild with no abnormalities stemming from the condition; therefore, activity restrictions and limitations were not medically supported.

30.    The above conclusions drawn by Dr. Shepard directly contradict the opinions and findings of Ms. Ray's medical providers.

## **Seronegative Rheumatoid Arthritis**

31.    On January 14, 2020, Dr. Shaung Song placed Ms. Ray on triple therapy for rheumatoid arthritis (RA), with the next step in medication being biologics, demonstrating that her RA was worsening and not controlled.

32.    Dr. Song also recorded abnormal c-reactive proteins, abnormal CBC with differential, an abnormal metabolic panel, and an abnormal erythrocyte rate, all tests used to establish inflammation and swelling associated with rheumatoid arthritis.

33.    Additionally, Dr. Song concluded that a previous increase in methotrexate, an arthritis-controlling drug, made no difference in Ms. Ray's chronic or arthritic pain levels.

34.     Medical records from Dr. Song show that Ms. Ray's RA was worsening, uncontrolled, and debilitating.

35.     Dr. Shepard did not express what other physical abnormalities would have better supported a showing of debilitating RA.

36.     By relying solely on Dr. Shepard's opinion and failing to consider the whole of Ms. Ray's RA diagnosis, Lincoln demonstrated a failure to perform a full and fair review of Ms. Ray's LTD disability claim.

**Fibromyalgia**

37.     While there are no laboratory tests for the presence or severity of fibromyalgia, like RA, symptoms include "pain all over," fatigue, disturbed sleep, muscle tenderness, and stiffness, among others.

38.     Despite the lack of physical tests used to assess fibromyalgia, the medical profession views the medical condition as debilitating

39.     The aforementioned symptoms inherently create restrictions and limitations on a person's performance when suffering from fibromyalgia.

40.     Ms. Ray's fibromyalgia has repeatedly been documented by her medical providers secondary to her RA.

41.     Lincoln failed to consider fibromyalgia's affect on Ms. Ray's physical ability to perform her job duties.

42.     Lincoln's failure to consider Ms. Ray's fibromyalgia demonstrates a failure to perform a full and fair review of Ms. Ray's LTD disability claim.

**Chronic Pain and Spinal Issues**

43.     In 2017, Ms. Ray was involved in a motor vehicle accident.

44.     Following the accident, an MRI of Ms. Ray's back revealed both an annual diffuse disc building at L4-5 with a superimposed shallowed center protrusion and mild to moderate bilateral foraminal stenosis at the L4-5 region.

45.     Motor vehicle collisions do not cause spinal stenosis but do generally cause asymptomatic cases of spinal stenosis to become symptomatic.

46.     Since the 2017 accident, Ms. Ray's records repeatedly reveal significant joint pain and tenderness, which is synonymous with Ms. Ray's chronic pain and other diagnoses.

47.     Dr. Song has reported that this chronic pain centers in the left buttock, lateral thigh, radiating to the left lower extremity, hips, shoulder, ankles, hands.

48.     While Lincoln's reviewers claim that the pain stemming from Ms. Ray's back injuries is only mild, Dr. Maliendra Gunapooti, Ms. Ray's pain management provider, has documented that there has been a consistent failure of conservative treatment to alleviate Ms. Ray's chronic pain.

49.     Dr. Gunapooti has recommended that surgical intervention is the only possibility to resolve the issues related to Ms. Ray's spine

50.     For religious reasons, Ms. Ray has declined these surgical interventions.

51.      On January 16, 2019, Dr. Gunapooti outlined the following restrictions that allow Ms. Ray to:

a.  Occasionally lift up to ten pounds;

b.  Never carry/lift over eleven pounds;

c.  Occasionally sit, stand, walk, climb, bend, kneel, drive, and finger handling (very limited);

d.  Never reach above the shoulder

e.   No excessive bending, twisting, pushing, or pulling; and

f.   Avoid extremely cold temperatures.

52.   On August 1, 2019, Lincoln also received an almost identical set of restrictions and limitations from Dr. Priya Patel, a former medical care provider of Ms. Ray's, which excluded the temperature restriction.

53.   From September 2020 through May 2021, Dr. Gunapooti has noted no significant changes in Ms. Ray's restrictions and limitations of physical mobility and functionality.

54.   By relying solely on Dr. Shepard's opinion and failing to consider the whole of Ms. Ray's spinal injuries, Lincoln demonstrated a failure to perform a full and fair review of Ms. Ray's LTD disability claim.

**<u>Undated Peer Review</u>**

55.   While not addressed in Lincoln's 2nd level appeal denial letter, a large part of Lincoln's adverse determination was based on Dr. Robert Cirincione's undated peer review.

56.   Following a review of Ms. Ray's medical records, Dr. Cirincione agreed that Ms. Ray had restrictions and limitations resulting from her conditions but determined these restrictions were less strict than those proscribed by Ms. Ray's treating physicians.

57.   In the second denial letter, Lincoln did not explain why Dr. Shepard's lack of restrictions was medically more appropriate and supported by the medical evidence than the restrictions set forth by Dr. Cirincione.

58.   Lincoln's decision to disregard Dr. Cirincione's restrictions was arbitrary and capricious, a breach of fiduciary duties not based on substantial evidence, and was the product of a conflict of interest and serious procedural irregularities.

**Transferrable Skills Analysis**

59.     Despite crediting Dr. Shepard's conclusion, the second-level claim analyst found that a prior Transferrable Skills Analysis conducted—based on Dr. Cirincione's restrictions—was appropriate for Ms. Ray's occupational ability.

60.     The analysis resulted in five light or sedentary level jobs that would provide sufficient income to disqualify Ms. Ray from continued benefits under the terms of her LTD disability Plan.

61.     In response to the Transferrable Skills Analysis, Ms. Ray retained the services of Vargas Vocational Consulting to review her medical evidence, conduct an interview with Ms. Ray, and analyze the results of Lincoln's Analysis.

62.     The Vocational Assessment concluded the following:

   a.   The restrictions and limitations prescribed by Ms. Ray's treating physicians were supported by the medical records contained in the claim file;

   b.   Ms. Ray's work and education experience was significant for training as a medication technician, an associate degree in Occupational Therapy Assisting, and work as an occupational therapy assistant;

   c.   The jobs identified by Lincoln were not based on Ms. Ray's work experience and education or due to the physical requirements of the stated jobs; and finally,

   d.   Ms. Ray was totally disabled and unable to perform even sedentary work.

63.     The Vocational Assessment submitted to Lincoln by Ms. Ray properly refuted Lincoln's Transferrable Skills Assessment findings by properly relying on Ms. Ray's actual restrictions and limitations.

64.     Lincoln disregarded the Vocational Assessment submitted by Ms. Ray in favor of an analysis based on its own restrictions and limitations and not those outlined by Ms. Ray's medical providers.

## Functional Capacity Evaluation

65.     Ms. Ray further submitted an independent Functional Capacity Evaluation (FCE).

66.     The FCE was performed on January 25, 2021, in response to Lincoln's contention that there was a lack of evidence to support the severity of Ms. Ray's loss of functionality.

67.     The objective results of the FCE demonstrated that Ms. Ray was not functional consistent with the full duty demands of an Occupational Therapist Assistant.

68.     The FCE also found that Ms. Ray is limited to the amount of time she can sit or stand in one day at a sub-sedentary level.

69.     Additionally, the FCE found that Ms. Ray's functional limitations further extended to her ability to reach, lift, and other necessary movements needed for sedentary level work.

70.     The completed FCE was also sent to Vargas Vocational Consulting.

71.     Vargas Vocational Consulting concluded that the FCE further demonstrated that Ms. Ray is unable to participate in the open job market due to her functional limitations.

72.     Lincoln determined that the FCE did not support restrictions or limitations placed upon the claimant's physical activities.

73.     Lincoln does not explain how its reviewers reached the conclusion described in paragraph 72.

## Social Security Disability

74.     Lincoln failed to address any finding of Social Security regarding Ms. Ray's disability, or even that Ms. Ray made an application for Social Security Disability Insurance (SSDI).

75.     In their denial letter, the appeals specialist claimed Ms. Ray's Social Security information was requested on November 16, 2020, and November 17, 2020.

76.     On December 17, 2020, Ms. Ray submitted to Lincoln her May 11, 2020, Important Information letter from the Social Security Administration.

77.     The letter was received by fax that same day by Lincoln and placed in Ms. Ray's claim file.

78.     Lincoln states in its denial letter that it received no information from Ms. Ray regarding SSDI, and therefore, did not consider it when making Ms. Ray's adverse LTD benefit determination.

79.     The failure to consider Ms. Ray's SSDI is indicative of an incomplete and unfair review of Ms. Ray's LTD disability claim.

### Surveillance

80.     From April 27 to April 28, 2020, Lincoln conducted ten hours' worth of surveillance of Ms. Ray's home.

81.     During the span of the surveillance, "no claimant activity was noted."

82.     After the second day of surveillance, Lincoln discontinued the efforts because no activity was noted.

83.     Lincoln failed to address the surveillance conducted during the first and second appeals.

84.     The results of these surveillance efforts serve as clear objective evidence that Ms. Ray suffers from day-to-day levels of extreme activity.

85.     Failing to consider the results of Lincoln's own surveillance is indicative of an incomplete and unfair review of Ms. Ray's LTD disability claim.

## Wrongful Denial of Benefits

86.     Finally, Lincoln sent the evidence outlined above to Dr. Aruna Yarrozu, an independent physician who is Board Certified in Physical Medicine and Rehabilitation.

87.     Dr. Yarrozu concluded that the records do not support a level of impairment that translates into restrictions and limitations from March 27, 2020, onward, claiming there was no objective evidence of Ms. Ray's rheumatoid arthritis, fibromyalgia, and other such conditions her treating physicians had diagnosed.

88.     Lincoln relied on Dr. Yarrozu's opinion to deny Ms. Ray's benefits, which directly contradict the medical opinions of Ms. Ray's treating physicians.

89.     However, based on both the FCE and Vocational Assessment, and the voluminous medical records submitted to Lincoln, there is more than sufficient evidence to demonstrate that Ms. Ray is unable to perform any occupation.

90.     On June 29, 2021, Lincoln upheld its prior adverse determination, maintaining the medical evidence did not support a total disability.

91.      Ms. Ray has appealed all adverse benefit determinations and has exhausted all administrative remedies.

92.     At all relevant times, Ms. Ray has been under the care of licensed medical providers.

93.     Despite providing substantial evidence that she has been continuously and totally disabled under the terms of the Plan, Lincoln has denied and has continued to deny Ms. Ray's LTD benefits.

94.     As a result of Ray's wrongful denial of benefits, Ms. Ray has been damaged in the amount of unpaid benefits.

95.     Lincoln's denial of long-term disability benefits was arbitrary and capricious, a breach of fiduciary duties not based on substantial evidence, and was the product of a conflict of interest and serious procedural irregularities.

96.     Lincoln is required to pay the benefits due under the terms of the Plan, together with prejudgment interest, attorney's fees, and costs.

**WHEREFORE**, Plaintiff Latina Ray respectfully prays for judgment against Defendant The Lincoln National Life Insurance Company in the amount of past unpaid benefits, for an Order that Defendants begin future short-term disability and optional disability benefits payments to Plaintiff under the terms of the Plan, for attorney's fees and costs, and for any other such relief as the court deems just and proper.

### <u>COUNT II</u>
### <u>BREACH OF FIDUCIARY DUTY PURSUANT TO 29 U.S.C. § 1132(a)(3)</u>

97.     Ms. Ray brings this claim against Lincoln under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which permits a participant to bring an action to enjoin any act or practice which violates ERISA or the terms of the plan or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or the terms of the Plan.

98.     Lincoln is a Plan Administrator under the plan.

99.     As a Plan Administrator, Lincoln both decides a beneficiary's right to benefits and pays those benefits thereby Lincoln bears an inherent conflict of interest.

100.    Section 29 U.S.C. § 1104 codifies the fiduciary duties that Lincoln as Plan administrator owes to beneficiaries like Ms. Ray, they are the Duty of Loyalty and the Duty of Prudence.

101.    The duty of loyalty requires the plan administrator to convey complete and accurate information material to the beneficiaries right to benefits under the plan

102.    The duty of prudence requires the plan administrator to act as a reasonably prudent claims adjuster would in the circumstances.

103.    ERISA § 503, 29 U.S.C. § 1133 requires that every employee benefit plan must:

   a.   provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant; and

   b.   afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

104.    29 C.F.R. § 2560.503-1 codifies the plan procedures that are required to be implemented in every ERISA governed plan in order to guarantee that Plan administrators fulfill their fiduciary duties and provide a full and fair review of all claims made under an ERISA governed plan.

105.    Lincoln failed to adequately implement claims procedures that complied with 29 C.F.R. § 2560.503-1 and as a result, breached the dual fiduciary duties it owed Ms. Ray.

106.    Lincoln did not provide Ms. Ray with a reasonably clear explanation of what standards and guidelines it was utilizing to determine that Ms. Ray's records did not support the disabling physical impairments he continues to suffer.

107.    Defendant Lincoln breached the duty of loyalty by failing to adequately communicate with Ms. Ray:

a)    Why Lincoln believed Ms. Ray's medical records did not support the severe and ongoing physical impairments she was suffering.

b)    What evidence Lincoln needed from Ms. Ray for Lincoln to reverse its determination that she did not meet the definition of disabled.

c)    What Lincoln believed was a significant enough change in Ms. Ray's condition to warrant termination of Ms. Ray's LTD benefits.

108.    Defendant Lincoln breached the duty of Prudence by:

a)    Failing to thoroughly and properly consider the additional medical records Ms. Ray provided with her appeal letter demonstrating ongoing, intensive treatment of her symptoms.

b)    Failing to properly shield its self from its conflict of interest

c)    Fialing to properly consider all supporting evidence, but instead generating its own evidence to support denial.

109.    The above breaches are the byproduct of a review process that is not compliant with 29 CFR § 2560.503-1, which results in an exacerbation of the inherent conflict of interest of Lincoln being both the decider and payer of benefits and permits Lincoln to routinely breach the fiduciary duties it owes to beneficiaries such as Ms. Ray.

110.    The breaches were also the byproduct of Lincoln's arbitrary and inconsistent interpretation of plan provisions that were made to the detriment of Ms. Ray and in favor of Prudential and Prudential's financial interest in denying Ms. Ray's claims.

111.    As a result of Lincoln's breaches of the dual fiduciary duties of loyalty and rudence owed to Ms. Ray under ERISA, Ms. Ray suffered actual harm, as he was denied benefits to which he was entitled under the Plan, he incurred attorneys' fees and costs, and he suffered other financial losses.

112.    Lincoln breached its fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, insofar as it failed to discharge its duties handling Ms. Ray's benefits claim in a careful, skillful, and diligent manner.

**WHEREFORE**, Plaintiff Latina Ray respectfully prays that this Court:

1) Grant judgment in his favor and against Defendant on all claims;

2) Order that Defendant pay restitution for all benefits that Ms. Ray is entitled to but for the Prudential's breaches of fiduciary duties;

3) Declare Plaintiff's rights under the terms of the Plan, and clarify his rights to future benefits under the terms of the Plan;

4) Enjoin Defendant to provide a procedure for a full and fair review of adverse determinations under the Plan in accordance with 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1;

**Respectfully submitted,**

**GALLAGHER DAVIS, L.L.P.**

*/s/ Adam J. Olszeski*
Matthew R. Davis  #MO58205
Adam J. Olszeski  #MO66126
Gallagher Davis, LLP
2333 S. Hanley Road
St. Louis, MO 63144
(314) 725-1780
(314) 725-0101 Fax
matt@gallagherdavis.com
adam@gallagherdavis.com